## Williams's Appeal.

1. A testator devised his whole estate (after some legacies) to his executor, in trust to select and purchase a lot in Philadelphia, thereon to erect a building for the Philadelphia Library Company; and as soon as the building should be completed to convey the lot to the company; he afterwards purchased a lot himself; a few days before his death he directed that the building should be erected on that lot; and at his request the executor verbally promised the testator that he would erect the building there; after the testator's death he selected it. He answered to a bill to declare him disqualified to act as a trustee by reason of having trammelled his discretion by his promise, that he had selected the lot not only in accordance with the testator's wishes but with his own judgment, after a careful deliberation. *Held*, that his discretion was not so controlled as to disqualify him.

2. Such trust could not be taken from the donee except on the clearest evidence of his incapacity, or that he was acting in fraud of his powers.

3. The verbal direction of the testator and promise of the executor, were not a fraud on the power in the will, and the trustee was bound to perform the promise.

4. A chancellor will so control a trustee that he shall not disappoint the intent of the donor, as gathered from the instrument containing the power.

5. An innocent motive will not save the exercise of the power if it violate the true purpose of the trust.

6. When a testator, to fulfil his own purpose, confers an absolute discretion, it is his right to have the power executed by his own trustee, and a court cannot displace the trustee without clear and adequate cause.

7. Hoge *v.* Hoge, 1 Watts 163; Naglee's Estate, 2 P. F. Smith 154; Pulpress *v.* African Church, 12 Wright 204, recognised.

[Williams's Appeal.]

February 27th, 28th and March 1st 1873.   Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the decree at Nisi Prius: No. 1, to July Term 1871.   In Equity.

The proceeding in this case was by a bill filed April 11th 1871, by The Library Company of Philadelphia, against Henry J. Williams.

The questions in the case arose under the will of Dr. James Rush and its codicils.

The will was dated February 26th 1860, and contained the following provisions: * * *

"It is my intention, by a codicil or codicils to this my will, to give considerable legacies, annuities, and devises to different persons, but as I desire to take some time for reflection on this subject, and as I have made up my mind as to the disposition of my residuary estate after the payment of these legacies, annuities, and devises; now, therefore, I do hereby give, bequeath and devise my whole estate, real and personal, legal and equitable, whatsoever and wheresoever the same may be, unto my brother-in-law, Henry J. Williams, of the city of Philadelphia, his heirs and assigns, to be held by him for and upon the following trusts and purposes, and for and upon no other use, trust, or purpose whatever—that is to say:— * * *

"In trust, to select and purchase a lot of ground not less than one hundred and fifty feet square, situate between Fourth and Fifteenth and Spruce and Race streets, in the city of Philadelphia, and thereon to erect a fire-proof building sufficiently large to accommodate and contain all the books of the Library Company of Philadelphia (whose library is now at the corner of Fifth and Library street), and to provide for its future extension according to plans, directions, and specifications which I shall hereafter make or give; but if I should not make or leave any such plans, directions, or specifications, then to erect the same according to his best judgment and to the views which I have expressed to him. It is my wish that this building should be exceedingly substantial, completely fire-proof, without any large, lofty, or merely ornamental halls or lecture-rooms; the whole interior to be divided in such a way as to contain the greatest number of books, to be well lighted, and so arranged as to be of easy and convenient access.

"AND UPON THIS FURTHER TRUST, so soon as this building is completed and ready for occupation, then in trust to convey the same, with the lot of ground whereon it is erected, unto 'The Library Company of Philadelphia' aforesaid, and their successors, for the uses and purposes of their library, and for no other use or purpose whatever.

"*Provided*, however, that before any such conveyance shall be made to the said Library Company, they shall, either by an alter-

ation in their charter, or in some other way satisfactory to my executor, bind themselves and their successors to conform to and comply with the following express conditions, and any others I may hereafter impose, under which they are to hold the said property and all other bequests and devises herein or hereafter given to them :—

" *First.* That the said Library Company shall not cause, allow, or permit any lectures, * * *

" These are objects foreign to and inconsistent with the legitimate purposes of a public library, and it is only for the preservation, extension, and free and convenient use of such a library, without any ambitious or pretentious display, that it is desired to make provision.

" *Second.* That all the accounts of the receipts and expenditures from the estates aforesaid, real and personal, shall be kept separate and distinct from all other accounts of the said Library Company, and shall all be headed and kept as the accounts of ' THE RIDG-WAY BRANCH OF THE LIBRARY COMPANY OF PHILADELPHIA,' so that it may be always easily and certainly ascertained whether the application of those estates and the income derived therefrom has been in accordance with the provisions of this my will.

" And I further will, direct, bequeath, and devise that whenever the said building shall have been completed and transferred to the said Library Company, and the preliminary conditions complied with, then my said executor shall assign, transfer and convey, by one or more deeds and instruments, all the rest and remainder of my residuary estate not laid out and expended in the purchase of the lot and the construction of the building aforesaid, and in the legal and customary charges and expenses, unto the said Library Company, to be held and used by them and their successors for the following uses, trusts and purposes :—

" *First.* In trust to keep the whole of the real estate granted and conveyed to them by my executor, in good order and repair, and to make from time to time such additions to the library building as may be found necessary for the extension and preservation and convenient use of the said library and all additions thereto.

" *Second.* In trust, after paying all necessary taxes, charges and expenses incident to the said property, to set aside annually ten per cent. of the clear net income, to form a contingent fund, to be invested, and the interest added to the principal, which fund, or so much thereof as may be required, shall be applied :—

" First. To build upon, improve, alter, and renew any lands and tenements hereby devised to the said company, so as to increase the income derived therefrom.

" Second. To make good and replace any losses from the failure of any investments made of or from the property hereby bequeathed for the said company ; and,

" Third. Whenever the said contingent fund shall amount to $30,000, then to pay over and apply the whole surplus beyond the said $30,000 for the general purposes to which the income of this residuary estate is herein directed to be applied.

" *Third.* In trust to pay all necessary salaries, &c. * * *

" *Fourth.* And in trust, after complying with and fulfilling the previous trusts and purposes hereinbefore contained and expressed, to apply the remainder or surplus of the said net annual income, or so much thereof as may be necessary or desirable, to the increase and extension of the said library. * * *

"Lastly. I hereby appoint my brother-in-law, Henry J. Williams, executor of this my last will and testament."

By a codicil dated May 16th 1866, the testator provided : * *

" *Whereas,* By my said last will and testament, I have provided that the bequests and devises to the Library Company of Philadelphia are to be held under the conditions and restrictions therein contained, and any others which I might thereafter impose ; now, therefore, in accordance with, and in execution of that provision, I add and impose the following conditions, restrictions and directions :—

" *First.* One of my objects in giving my residuary estate for the use of the said Library Company was to express my respect and regard for my father-in-law, the late Jacob Ridgway, and my affection for and gratitude to his daughter, Phœbe Anne Rush, by erecting to their memories a monument which I hope will prove more durable than any other grateful record I could make, and be infinitely more useful to the community. As it was from them I derived the greater part of my property, which has enabled me to devote happily, and undisturbed, the latter part of my life to pursuits of scientific inquiry, which I have designed to be more beneficial than the more common enjoyment of an ample fortune, it is both just and proper that I should thus employ it, the more especially as Mrs. Rush had led me to believe that if she had survived me, she would have applied it to a similar purpose. Now, in order to carry out this intention in a public and permanent form, I direct my executor to have a marble slab, with the following inscription : * * *

" *Sixth.* I give and bequeath all my pictures, my private library, my manuscripts, copyrights and papers, and also those of my father, Dr. Benjamin Rush (in my possession) to the Library Company, to be by them placed in a room in the new building, and there safely kept. The books may be used as the other books of the Library Company, but this room is not to be opened to gratify idle or objectless curiosity.

" *Seventh.* I will and direct that the building to be erected for the Philadelphia Library Company, under the provisions of my

will, shall have a basement story, of a height not less than eight feet six inches above the level of the pavement at its front. * * *

"*Eighth.* If the Philadelphia Library Company should omit or decline to accept my residuary estate on the terms and conditions in my will and codicils contained, or fail to comply with any of the preliminary stipulations and directions therein mentioned, then I give and devise the whole residue of my estate, real and personal, whatsoever and wheresoever the same may be, after paying and securing all annuities, bequests, legacies and devises, other than those to the said Library Company in this, or any future codicil contained, unto Henry J. Williams, my executor, in my said last will named, his heirs, executors and administrators in trust therewith, to found and endow a public library entirely distinct from and independent of the Philadelphia Library Company, to be named and called the Ridgway Library, under the rules, regulations, conditions and stipulations in my said last will, and the codicils thereto expressed and contained. I wish that the greater part of my estate may be spent in completing the new library building. The annuities as they expire and fall into my residuary estate will be amply sufficient for all the legitimate purposes of a library. * * *

"*Twenty-eighth.* I desire my executor to be allowed a commission of three per cent. upon the administration of my estate; and, in the case of the death of my brother-in-law, Henry J. Williams, whom I have named as my executor in my last will, either before or after me, I nominate and appoint Colonel Alexander Biddle and Thomas Craven to be my executors in his room. They are not, however, to assume the executorship, or be qualified therefor, until after his death, resignation or refusal to act."

By another codicil dated April 18th 1867, the testator provided: * * *

"*First.* I have given and devised the greater part of my estate to my executor for the purpose of erecting for the Library Company of Philadelphia a building not only large enough to contain their present books, but also their probable increase for many years to come. Now, as I do not desire that the Library Company shall have an income greater than is required to provide for the legitimate (not a competing) increase of the library and their current expenses (not to be so large as to invite extravagance and waste), for which purposes the sums to be set apart to secure the legacies and annuities given by my said will and testament will be sufficient, I hereby authorize and direct my said executor to expend the whole remainder of my estate in the purchase of a lot and the erection of the library building, construction of bookcases, &c., leaving the said company only an income sufficient to defray the ordinary and strictly appropriate expenses of such an institution. * * *

[Williams's Appeal.]

" *Second.* I have in my will limited the extent of the lot to be purchased for the library building, as well as its locality ; but as I desire that it shall have not only strength, durability and accommodation, but also be of sufficient magnitude for any future or contingent, but not an ambitious or competing, increase of the library ; in order to prevent, if possible, its being torn down in twenty years, and the lot sold at a speculative profit to suit the hyperbole of the times, I authorize and allow my executor, under a broad and thoughtful foresight, to increase the size of the lot, and select any situation he may deem most expedient, without regard to any provision of my will or codicils. \* \* \*

" *Fourth.* In order to insure, as far as is in my power, the application of the various devises and bequests which I have made for the use and benefit of the Library Company, in accordance with my wishes and directions, I hereby devise, direct, will and declare that the whole and every part of my estate, real and personal, given or devised for the use and benefit of the said Library Company, and all the books and furniture purchased by them with the income and proceeds thereof, shall be taken and held by them (whenever the same by the provisions of my will, or of any codicil thereto, shall come into their possession, and become subject to their control), as trustees, for the uses, objects, trusts and purposes in my said will, and any codicil thereto mentioned and expressed." \* \* \*

The bill set out the incorporation of the plaintiffs by the proprietaries on the 25th of March 1742, &c., and that by the will of James Logan and from other donors they had become the owners of the Loganian Library and other libraries.

After setting out the purposes of their incorporation they averred that they were a corporation for charitable and literary uses, and were entitled therefore to the aid of a court of chancery for preserving and protecting their rights.

They further averred that for the safety of their books, &c., and the better to accommodate the community, they had taken steps to procure means to change the location of their library building, and to erect one more secure against fire, &c. ; that Dr. James Rush, an active stockholder in the library, was interested in it, and knew the anxiety of the company as to their books, &c.

The bill further set out: that for carrying out that end Dr. Rush " conceived the munificent design of providing such a building for said libraries." The bill then goes on, and in the 8th, 9th 10th and 11th paragraphs sets out in substance the provisions of the will and codicils, so far as they relate to the library, and proceeds :—

" XII. Your orators are advised and charge, that, from the tenor of the said will, it is clear that the testator expected and designed that the building he directed his executor to put up would

[Williams's Appeal.]

be used, if the Library Company were willing to accept the conditions imposed upon them, as a place of deposit of their own books, as well as those purchased with the funds provided by him.

" They aver that there is nothing in the will of the testator tending to show a desire to interfere with, or trammel the corporation in the use of its books as a circulating library—that is, lending them for use at the homes of the members—or to confine either the present library, or the library bought with his funds, to being used within the building, or to encourage that mode of user.

" They aver and charge that the discretion given to his executor to select the site of the intended building is in the nature of a trust for the benefit of your orators as a charitable corporation, and that the whole tenor of the will indicates that it was the intention of the testator to found a charity which should be beneficial to your orators as a library company having a collection of books, by affording or providing them a building for that purpose—that this general intent was clogged with no conditions, saving such as have been already distinctly set forth, and that the power to select the site was merely incidental to the execution of that main purpose—that, on complying, or being ready to comply with such regulations and conditions, your orators have the right to have the said powers exercised in aid of that general object and intention; and that, as it was incompetent for the testator, by verbal or unsigned directions, to revoke or vary the said gifts and trusts, so it was incompetent for him to change or affect the general intent of the will, or to qualify the powers thereby given to carry out that general purpose.

" XIV. On the 29th of June, at a special meeting, the shareholders appointed a committee on the devise to report at an adjourned meeting of the shareholders.

" XV. At an adjourned meeting held on the 5th of October 1869, the committee reported, among others, the following resolution:—

" *Resolved*, That the stockholders of the Library Company of Philadelphia do hereby accept the legacy of Dr. James Rush, according to the terms expressed in his will."

This resolution was adopted at a subsequent meeting of the stockholders held October 19th, and another committee appointed to recommend what further action should be taken.

XVI., XVII. At a meeting of the shareholders, held May 25th 1870, the committee reported that an Act of Assembly had been passed February 23d 1870, authorizing the Library Company 'to act as trustees of the Ridgway Branch of the Philadelphia Library, and the trusts pertaining thereto,' under the will and codicils of Dr. Rush; and the company was further authorized to apply from time to time to the Court of Common Pleas of Philadelphia for such amendments to their charter as might be necessary to carry the

provisions of the will and codicils into effect. The company accepted the provisions of the act, and applied to the Court of Common Pleas for certain amendments (set out in the paragraphs) to their charter, which the court decreed should be made.

" XIX. Shortly after your orators had heard of the dispositions of the testator's will, they also learned that the defendant, his executor, had formed the intention to select, as the site of the building to be erected under the terms of the trust, a lot of ground at the south-east corner of Broad and Christian streets, in the city of Philadelphia. * * *

" XX. This site was, in the general opinion both of the directors and shareholders, an undesirable one for the purpose. It was especially undesirable as a site for a building which should contain the collection of books of the Library Company. It was believed by all to be very inconvenient for the purposes of the said company as established and used up to this time, and it was believed by much the larger number that such a site would be injurious, if not destructive, to the interests and future prospects of the company, as the remoteness of the location from the residences or places of resort of all the shareholders, or persons accustomed to make use of the books, would, practically, prevent the library being used for the purpose for which it had been founded and had always been maintained,—and hence the income derived from contributions of shareholders, without which the institution could not be supported or continued, would cease. And your orators expressly show to the court that the said proposed site is not less than half a mile south of the usual places of resort of nearly all their shareholders, and more than a mile out of the line of travel of the large majority using, or entitled to use the library.

" XXII. Your orators, therefore, deeply impressed with the great advantages that might be derived from a proper use of the discretion given by the testator to his executor,—the desirableness of having a proper building for the preservation and use of their library in a convenient location—the waste of money consequent on the erection of two buildings so remote from each other, for one common object—the still further waste in the maintenance of two distinct establishments therefor, and the apparent violation of the cardinal intent of the testator by so doing, used all the influence they possessed to prevent such a selection of the site by the defendant."

XXIII. When the company had accepted the bequest and the amendments to their charter had been allowed, on the 10th of December 1870, the directors passed resolutions to notify Mr. Williams, the executor, that the amendments had been allowed and that they were "now ready to undertake the performance of their duties as trustees of the Ridgway Branch of the Library." They also adopted resolutions that in their opinion, the erection of the

library building on the lot on the corner of Broad and Christian streets would be destructive of the interests of the library and against the wishes of a large majority of the stockholders, and that they expressed to Mr. Williams "their earnest hope and request that he would reconsider his intention of building on the site named." They also appointed Dr. Willing, Judge Hare and Mr. Lea to communicate these resolutions to Mr. Williams and to confer with him on the subject.

"XXIV., XXV. At and before this time, your orators had learned that the defendant, in making the selection of the said site at Broad and Christian streets, was not acting either under the directions of the testator as contained in his will, nor in the proper and legal exercise of the discretion which the will had given to him, but that before and at the time when the said will was admitted to probate, he had disqualified and disabled himself from exercising any discretion whatever in the premises; by a most solemn verbal promise, made to the testator in the extremity of his last illness, and within a month of his death, not to exercise any discretion at all, but to use a particular piece of ground, and no other, as the site of said building.

"XXVI. At a meeting of their shareholders, held on the 29th of June 1869, the defendant was present, and he then verbally mentioned his determination to place the said library on the Broad street lot. After the meeting, being strongly urged by the committee to change that site for another equally good, and in a more central location, he assigned, among other reasons for his determination, that a loss to the estate would ensue if the lot was not used for that purpose. In answer to this, it was at once arranged that any such loss would be met by voluntary contributions in relief of the estate; whereupon the defendant declined the proposition, and announced his final determination to place the building upon that lot, under all circumstances and regardless of all consequences, unless prevented by a court of competent jurisdiction.

"XXVII. In answer to a letter from Dr. Willing, the chairman of the committee appointed on the 10th of December 1870, the following communication was received from the defendant:—

"Chestnut Hill, Dec. 30th 1870.

"My Dear Doctor:—I did not intend my note of the 17th instant to be a formal reply to the resolutions of the directors of the Library Company, nor to prevent the committee from having the conference they requested. So far from it, that I mentioned both time and place at which I would have been happy to meet them. I cannot, however, conceal my conviction, that nothing they would say would change my intention of placing the Ridgway branch of the Philadelphia Library on the lot purchased by Dr. Rush for its site; and, after all that has taken place, I must con-

23 P. F. Smith—17

fess I am a little surprised that they should again ask me to do so. Judge Hare and yourself must both be fully aware of the circumstances connected with the selection of that lot for this purpose; but, as Mr. Lea, one of your committee, is a new member, I shall repeat them, even at the risk of being unnecessarily tedious in my answer; for I cannot believe the directors could expect *me* to make the change they desire, if they fully appreciated my position.

" Some weeks before Dr. Rush's death he was very anxious to have the location of the intended building finally fixed and settled; and he desired me to ascertain the size and cost of all the vacant lots on Broad street, on which street he desired it to be placed. I procured statements of the sizes and prices of all I thought at all suitable, from Vine to South street, but he was satisfied with none of them. Another gentleman brought him a plan of the lot on Christian street, and he was so much pleased with it that he directed me to buy it at once. I did so; and when the contract was signed and a part of the consideration paid, he expressed great pleasure that it was concluded, as it relieved his mind from all anxiety. Some days after, he recurred again to this subject, as it had probably occurred to him that he had given me an absolute discretion as to the situation of the library by the terms of his will, and that I might be induced to overrule his decision after he was gone. He called me to his bedside and asked me to give him a promise that I would *build the library on that lot, and nowhere else.* I gave him this promise as fully and solemnly as language could express it, and he then thanked me and said he could now die in peace. Now, do you think it would be at all consistent with truth and honesty for me voluntarily to violate a pledge given under circumstances which render it as sacred as an oath, and made to a dying man who had confided to me the management of his whole estate? Would you, with your well-known delicacy and sensibility to all honorable engagements, feel yourself justified in doing so, were the case your own, and should I not lose your respect and regard (which I value very highly) were I to hesitate for a moment as to what was my duty?

" And what is the reason assigned why I should do this?—' to gratify the wishes of the shareholders.' But have these shareholders shown such an appreciation of the magnificent gift of Dr. Rush (which is only subject to their future acceptance) as to render his representative very desirous to comply with their wishes, in opposition to the repeatedly and earnestly declared intentions of Dr. Rush, and to his own deliberate judgment? When the question was first presented to them, these shareholders, by a majority of five, accepted his bequest, but, by a very much larger majority, refused to pass a resolution expressing their gratitude for his gift. True, at a subsequent meeting they adopted such a

[Williams's Appeal.]

resolution, but it was only on second thoughts; and it may be doubted whether it was not agreed to because of the extraordinary position in which they would be placed, if they were to take his money and refuse to admit they were obliged to him.

"I have said that to assent to the wishes of the shareholders would be in opposition to my own deliberate judgment, and I mean this in its fullest extent. I think that, considering its size, its price, and the description of library Dr. Rush intended to endow, there is not an attainable position on Broad street, of sufficient size to meet his views, which is preferable to the one he has himself selected.

"Now, the Library Company give me notice that the company 'are now ready to undertake the performance of their duties as trustees for the Ridgway branch of the Library,'—*duties* and *trusts* which I understand commence only when the building is finished; but I am not aware that they have shown, in any one instance, a disposition to comply with the last instructions of one whom I shall always consider as their munificent benefactor.

\*        \*        \*        \*        \*        \*        \*

Very truly yours,

H. J. WILLIAMS.

Dr. CH. WILLING, Chairman.

"XXVIII. While your orators are ready to appreciate the high moral conviction which the defendant feels, of his duty to abide by the promise thus made by him to his testator, and to fulfil the same, yet they are advised that it cannot be thus fulfilled to the prejudice of your orators, for the following reasons:—

"They are advised, and they so submit to the court, that all discretionary powers given to trustees are themselves trusts, and that in the exercise thereof the trustee is bound to use the same for the furtherance of the purpose for which they were given, and not otherwise; that, in the exercise of discretionary powers, the donee thereof cannot and must not act under the influence of motives other than such as should of right direct him in dealing with property not his own, and intrusted to him for a special purpose, and that if he be disabled from using his natural, unbiassed discretion or judgment in the exercise of the power, from any cause which binds or warps, or has a manifest tendency to warp the same, a court of equity will interfere to restrain such abuse of the trust, and to direct what should be done by such trustee according to a sound and unbiassed discretion.

"And they are further advised that the discretionary power given to the defendant by the will and codicils of the testator was in the nature of property of your orators, inasmuch as its exercise will vary and modify their rights, and will certainly, if exercised according to the defendant's expressed intention, destroy or

greatly impair the usefulness of the literary charity to be administered by them—that the verbal directions of the testator, varying the nature of the trust and confidence reposed by him in the defendant, and the rights which your orators, as devisees, had in the beneficial enjoyment of the exercise of that power, were as absolutely null and void as those of a stranger—first, by reason of being made within one calendar month prior to the death of the testator, and, therefore, void under the statute in such case provided—and, secondly, by reason of their not being in writing and signed by the testator at the end thereof, in accordance with the statute relating to wills.

"And they are further advised that, under the circumstances of this case—while it is true that a court of equity will not interfere with a trustee in the exercise of a discretionary power (save to see that a discretion is really exercised), yet, that looking to the fact that the object of this testator was to found a charity of this particular sort—a literary charity—by furnishing it with books and maintaining said building, and that it was certainly designed that your orators should administer that charity in connection with their own, and under one management, and, it was probably intended, in one building, and with one corps of servants and assistants—a court of equity, having control of charities, would, even if the donee had not so surrendered and bound his discretion before the trust had vested in him, interfere to prevent its improper exercise.

"XXIX. Your orators aver that nothing but the high moral conviction under which the defendant labors—of his duty to abide by his promise—blinds him to these consequences. And although true it is that the promise so made by him to his testator was wholly illegal and could not lawfully bind the former nor be enforced against him, yet your orators charge that the defendant did and does believe that his conscience was and is bound thereby, and that he would be doing a dishonorable act if he made any other selection.

"XXX. But the defendant at times insists that he has selected the said site in the exercise of *his own* discretion, unbiassed by said promise; but your orators charge that the defendant, having made the promise and believing himself bound by it, was and is utterly unable to determine what line of conduct he would have followed if he had not made such promise, and that a court of equity will not regard any assertion of what might or would have been the defendant's determination, had no such influence existed.

"XXXI. At other times the defendant alleges, as an excuse, that, as the testator agreed to buy the said lot for the purpose of having a library building erected thereon, he, the testator, did thus *himself* select the site for the building; and that he, the defendant, as trustee, had not the less a right to select voluntarily

the *same* lot which the testator had thus selected, or else that the testator's alleged selection, in some way or other, took the place of that to be made by the defendant, and was either binding, or could, at his option, be made binding, and, in fact and law, has been made binding, on all claiming under the will; the contrary whereof your orators charge to be true, and they aver that, by his own showing, it was not possible for the defendant, after the testator's death, to make a voluntary selection of that or any other site, because he had already, in the testator's lifetime, bound himself by his promise not to exercise the discretion which the will had given him, but to build the library on that site, and nowhere else. * * *

" XXXVII. Wherefore they pray equitable relief as follows :—

" 1. That the rights of your orators and of the defendant in the premises may be ascertained and declared.

" 2. That it may be declared and decreed that the power conferred on the defendant by the will of the testator was a trust to be administered by him only in the manner in which all trusts can or of right ought to be administered.

" 4. That the court may decree and declare that the defendant, being, at and before the time when the said trust vested in him, or supposing himself to be, under an obligation which bound his discretion as to the selection of a site for the said building, was and is thereby disqualified from and incapable of exercising the power and trust in that behalf given to him by the said will, and that the same may be exercised by this court having jurisdiction in the premises.

" 5. That it be referred to a master, to inquire and report what would be a proper and fit location for the said building, to the end that the true intent and purpose of the testator, as contained in his will, may be carried into full effect.

" 6. That the court may, from time to time, give such further instructions, and make such further orders and decrees in the administration of the trust as to them shall seem fit; and especially that it may declare how much of the corpus of the estate shall or ought to be expended and employed in the purchase of a convenient lot of ground, and the erection of a suitable building thereon.

" 7. That the defendant may be restrained by injunction, preliminary until the hearing and perpetual thereafter, from proceeding to erect the said building on the said lot situate on the southeast corner of Broad and Christian streets.

" 8. General relief."

In his answer the defendant set out :—

1. The wills and codicils and proceeded : * * *

" This will was proved on the 31st May 1869, on which day I took an oath to perform my duties as executor in accordance with

law. I have, from the outset, acted under advice of counsel. Until his appointment to the Bench of the Supreme Court of the United States, the Hon. William Strong was one of my legal advisers. I have never, since assuming the executorship, in act or thought, done anything contrary to what I believed to be my legal duty, as such executor, and I have taken no important step without first obtaining the advice and approbation of my counsel.

" The. testator knew that the Library Company had, for very many years, been striving to secure funds sufficient to erect a fire-proof building large enough to contain all their books, and their probable increase, and his provision that such a building should be erected in accordance with his views, was, with him, a favorite and constant matter of thought.

" He made many inquiries for eligible lots and as to proper places for building. He ascertained that the lot which, in 1860, he had thought sufficient would be too small, and that there would be a great difficulty if not an impossibility in obtaining with the funds he could leave, within the area first designated, such a one as would be required, and therefore, in 1867, removed all restriction as to limits. He was very anxious to have the matter of site determined before his death, and desired me and others to ascertain the size and cost of vacant lots on Broad street, on which street he particularly desired the building to be placed. I procured descriptions and prices of all I considered suitable, between Vine and South streets, but he was satisfied with none of them. Another gentleman brought him a plan of the lot at Broad and Christian streets, and he was so much pleased with it, that he instructed me to buy it, and I did so. The contract was signed on the 18th day of May 1869, and the title papers were directed to be sent immediately to Mr. Henry Wharton for his opinion thereon. A few days after this, the testator inquired whether I thought the Library Company would make any objection to the site, and I answered that from what I knew of the board, I believed they would not. He asked me to ascertain to a certainty their feelings on this subject, but not being willing that his testamentary intentions should be generally known, he only authorized me to communicate them to two of the managers, viz., Mr. Henry Wharton and Colonel Alexander Biddle, whose opinions I was requested to ask. I desired Colonel Biddle to accompany me to Mr. Wharton's office, and then stated to them that Dr. Rush had given almost his whole fortune, amounting to a million of dollars, to build a library at Broad and Christian streets, and asked them if they thought the Library Company would object to that location. They declared that, considering the magnificence of the gift, the Library Company ought not, and they believed would not, make any objection to his wishes as to its position. Dr. Rush, to whom I immediately returned, was informed of the result of the interview—was greatly pleased, and having obtained the views of

three members of the board, appeared entirely satisfied. Had he known that his wishes, thus approved, would have been disregarded when he was gone, he would most unquestionably have embodied them in a form *legally* binding. It was after this, that the promise stated in my letter of 30th December 1870, was made to him. This was given with a knowledge of almost every circumstance which led subsequently to my decision, when, as his executor, it became my duty to determine the site of the library. Knowing, as I do, that this promise is not binding upon *me* the trustee in law, however it may be in morals and good faith upon the beneficiaries, I aver that I have never heard any reason assigned which would justify me in changing my opinion as to the propriety of this site. I have certainly seen none assigned in the bill which has been filed.

"If there had been a conflict between my sworn duty under my oath as executor, and my promise to the testator, I could have ended it by resignation of my executorship: but as no such conflict ever arose, it has never become necessary for me to determine what course, under such circumstances, it would be right for me to pursue.

"I selected the Broad and Christian street lot when I had assumed the executorship, after calm, careful and deliberate consideration—having thought of it in every shape, favorable and unfavorable, in which it had been presented—because it was, in my judgment, the best I could obtain for the objects and purposes of Dr. Rush's will—and because it combined adequate dimensions with cheapness and position. I announced my selection at the meeting of shareholders of the Library Company on the 29th of June 1869, and at the meeting held on the 5th of October 1869, the resolutions, alleged to have been resolutions of acceptance, were adopted.

"I was advised by my counsel in writing on the 9th of July, 1869:—

"'As executor you are guided by the written will. In the exercise of the discretion reposed in you by that instrument, you may regard Dr. Rush's views and wishes orally expressed, but, after all, *your* judgment, however it may be made up, must be your guide in matters left to your discretion.'

"In pursuance of this advice—for I have felt, and still feel, under the obligation of my oath of office, bound to perform my duty in accordance with the *law*—I considered, in all its bearings, without any bias, the matter of the site, but my conviction that it was the one by far the most expedient remained, and still remains, unchanged.

"Though protesting that the complainants have no concern with or control over my reasons for this decision so long as they are honest, which is not, I believe, denied, yet, in deference to the court, I will state some of those which influenced me at the outset,

and govern me still." (The answer then sets out these reasons very much in detail.)

"The testator's 'cardinal intent' was, that a building should be erected by me sufficiently large to accommodate for all time the books of the Philadelphia Library, such as would be an ornament to the city, and a lasting monument to his wife and her father. Broad street, in my opinion, is infinitely preferable as a site for such a building, because of the handsome private and public structures already upon it, and of the probability of many more being erected there in the future; because of its length and centrality, and of its great width, which furnishes an opportunity for architectural display that our narrow streets fail to afford. In this preference my testator shared. A location of the library upon any other street in the city would be decidedly against my judgment."

The answer then specifies a number of lots examined by him and the reasons for declining to take them.

"Neither the company nor the court can interfere with me in the selection of a site without cramping me in the matter of the building, over which I have a control that I believe has not been questioned.

"The site which I have selected is within easy reach of all parts of the city. South of it is an immense population which is annually increasing, and, in the opinion of many—an opinion in which I join—this portion of Broad street will ultimately be filled with magnificent residences. The facilities afforded by passenger railways are such, that to those north of it who may wish to use the library, a ride of a few squares additional will make no difference in cost and but little in time. * * * The city through which the 900 stockholders are scattered is sixty miles in circumference.

"The great size of this lot will always protect the library from the noise and bustle of the more crowded portions of the city, and from all danger from fires or nuisances in its neighborhood.

"I have chosen this site for these, among other reasons :—

"1. It is on the finest street of our city.

"2. It is, so far as I know, the only lot on that street sufficiently large for the building I must erect, which I can obtain at a reasonable cost.

"3. If compelled to purchase a lot elsewhere, I will not be able to erect the building ordered by the testator.

"4. I know of no suitable lot on any other street which can be had at the same cost.

"5. It is but little distant from the centre of the city, and is within easy reach, by car, of all portions of it.

"6. It will not be necessary to have the library building torn down in twenty years and the lot sold because of its limited dimensions.

"7. Its size insures, for all time, light, air, retirement, quiet, and safety from external dangers.

"8. It already belongs to the estate.

"9. It is exactly suited for the kind of library Dr. Rush proposed to endow—not a reading-room, nor one containing the light and ephemeral literature of the day, but one for readers and students of a higher grade.

"10. It will carry out the cardinal intent of the testator as *he* understood it, because it is the one he selected himself.

"I adhere to this choice and to my determination to build thereon notwithstanding the opposition which has been raised, because it was to my judgment, and not to that of others, Dr. Rush confided the performance of his testamentary dispositions. My judgment being at variance with that of others, I would lay myself open to charges which might be made in another bill, if I abandoned that which I have deliberately formed and announced. I may be wrong, and they may be right, and the testator might well have chosen many very much better fitted than myself to do the work imposed upon his executor, but *he* did not think so. We had been friends and connections from early manhood through lives so long protracted that almost all those whom he had known and trusted had gone. For twenty-five years I had been the trustee of himself and his wife. For upwards of half a century I had been his counsellor and adviser, and for these reasons he preferred me. Because I knew his *legally expressed* wishes, and intended, to the utmost of my ability, faithfully to execute them, I accepted the trusts he confided to me. * * *

"Since the filing of this bill I have consulted with the gentlemen who are named in the will as my successors—Alexander Biddle and Thomas Craven—and I have ascertained that they agree with me in the opinion that the site I have selected is the 'most expedient' which could be chosen. * * *

"3. I am advised, and therefore aver, that the complainants are not a corporation for *charitable* uses, as charged in the fifth paragraph, and that they are not as such entitled to the aid of a court of chancery for preserving and protecting their rights.

"5. * * * I am advised, and therefore aver, that the complainants are not a charitable corporation, and that the discretion given me to select a site for the library building is not therefore in the nature of a trust for them; but that if the law and the facts are as stated in the bill, then as the will speaks as of the day of the testator's death, if, in his lifetime, by his own act, he disqualified me from the exercise of the discretion given to me by the will, the bequest to the Library Company being dependent upon the exercise of that discretion as a condition precedent to the vesting of the estate, no court of chancery can dispense with the performance of that condition.

[Williams's Appeal.]

"I am advised, and therefore aver, that my disqualification to exercise my discretion, supposing it to exist, having arisen from acts of the testator himself, the complainants can take no benefits under his will conditioned upon a prior exercise of my discretion, however ready they may be to comply with all the 'other conditions and regulations.' * * *

"11. I deny that I have ever disqualified or disabled myself from exercising a discretion as to the site of the library building. I aver that in making selection of the site at Broad and Christian streets, I acted under the direction of the testator as contained in his will, and in the proper and legal exercise of the discretion thereby given to me.

"12. I deny the truth of the averments in the 25th paragraph, in the form in which they are put. I admit that I did, at his request, 'not in the extremity of the testator's last illness,' but whilst his intellect was as clear and strong as ever, within a month of his decease, promise him verbally, to use the said lot of ground at Broad and Christian streets as the site of the library building; and I aver, that at the time I made said promise I thought it the best lot for the purchase which could be obtained; and I aver, that after careful reflection and subsequent examination, I still entertain this opinion. I deny that I ever made 'a promise not to exercise any discretion at all' in reference to the site, or that any such words ever passed between Dr. Rush and myself.

"I said nothing which deprived me of the full power to form a judgment or opinion in reference to the propriety or expediency of selecting that situation. A promise to do a particular act does not prevent the formation or the expression of an opinion in relation to its propriety or expediency, and I believe that I am just as able to determine whether the site at Broad and Christian streets is proper or beneficial, as if I had made no promise at all. * * * I believe I can determine the question as to the eligibility of the site as correctly as if the subject had never been mentioned by Dr. Rush.

"I am sworn to execute the provisions of the will. One of these requires me to exercise an honest discretion, and I believe I have done so. If, however, my discretion under my oath had been in opposition to my promise, then I would have been obliged to reflect upon the course I should pursue; but as my oath—my opinion—that of the testator—and my promise all point to the same conclusion, I conceive my way to be clear, and my discretion not to be subject to be limited or controlled.

"When I gave my promise I was fully acquainted with most of the facts upon which I have since, under the will, formed my opinion. I was aware of the power I would be called upon to exercise if I became the executor, and believed that, in the proper exercise of that discretion, I would be able to fulfil my promise.

" 16. I do insist, as charged in the 30th paragraph, that I have selected the said site in the exercise of my *own* discretion, unbiassed by any promise; and I deny that any promise, however it may be felt to be morally binding, did prevent or can prevent my exercising, or knowing that I have exercised, my judgment. I aver, that I am now able to say what line of conduct I would have followed if I had never made a promise, and that I would have selected the site at Broad and Christian streets, if Dr. Rush had been silent as to his wishes.

" 17. I do aver, as alleged in the 31st paragraph, that I had a right to select voluntarily the same lot which the latter had selected, 'none the less' because he had selected it; and I admit my infinite satisfaction at being able conscientiously, and in fulfilment of his *written* requests, made 'more than one calendar month before his decease,' to gratify his wishes as to the manner in which his money should be expended." * * *

The defendant also demurred to the bill:—

1 and 2. That there had been no valid acceptance of the bequests; as there could be no binding acceptance until the building should be completed none of the preliminary conditions of the will had been complied with—(setting out these conditions.)

4. The plaintiffs are not a charitable corporation, nor within the protection afforded by courts of chancery to charities.

6. The court had no jurisdiction to control the defendant's discretion in selecting a site or exercising any of the trusts of the will.

A general replication having been filed, Richard S. Hunter, Esq., was appointed examiner. Upon the filing of his report P. Pemberton Morris, Esq., was appointed master.

The master, after having given the will in full and other undisputed preliminary matters in his report, found as follows:—

" The testator, on the 18th of May 1869, eight days before his death, agreed, through Mr. Williams, for the purchase of a square of ground situate at Broad and Christian streets, intending that the library building should be erected on that lot. The conveyance was not executed until some time after the death of Dr. Rush.

" Between the 18th of May, the day the contract for the purchase bore date, and the day of the death of Dr. Rush, some conversation passed between Dr. Rush and Mr. Williams as to whether the Library Company would approve of the location.

" After this conversation, and in consequence of it, as it would seem, Mr. Williams called upon Mr. Henry Wharton and Mr. Alexander Biddle to obtain their views on the subject.

" They failed to understand each other, owing, probably, to the fact that the conversation was hurried, and Mr. Williams and Mr. Wharton, at least, were looking at the matter from different standpoints, and were on an unequal footing so far as their knowledge of Dr. Rush's will was concerned.

[Williams's Appeal.]

" Mr. Wharton, under the impression that the lot at Broad and Christian streets was to be given for the building, with a large endowment fund to extend and increase the library (meaning the books), expressed it as his personal opinion that the directors ought to advise the stockholders to accept this gift, rather than that such a munificent gift should be lost to the city of Philadelphia.

" Mr. Williams, knowing the contents of Dr. Rush's will, and what he himself intended to say, had a different impression of the conversation, and takes the result of the conversation to be an absolute approval by Messrs. Wharton and Biddle of the projected purchase, and on the strength of that conviction, reported the conversation in that sense to Dr. Rush.

" About the second day after the interview with Messrs. Wharton and Biddle, when he was seated by Dr. Rush's bedside, the doctor turned and said, ' Harry, now you will promise me to put the building on that lot.' I said, ' Certainly, doctor, if you desire it, I will promise you that I will put it there, and nowhere else.' The doctor merely expressed his satisfaction." * * *

Amongst other correspondence reported by the master was the following :—

" 916 Spruce Street, December 13th 1870.

" Dear Sir :—I take this opportunity of enclosing a copy of resolutions passed by the Board of Directors of the Philadelphia Library Company, and to ask when it will suit your convenience to give the committee an interview to confer with you upon the subject to which they refer.

I remain with great respect, &c.,

CHARLES WILLING.

HENRY J. WILLIAMS, Esq."

" My Dear Sir :—

" I shall be happy to meet the gentlemen named in your note either as a committee or as individuals, but I must say that I feel it impossible to make any change in the location of the library upon the lot selected by Dr. Rush himself. It seems to me a sacred duty to carry out the clearly and repeatedly expressed wishes of the testator, and to perform what he undoubtedly understood to be a fundamental condition of his bequest. I moreover fully believe that, a few years hence, the position selected by him for his library building will be in all respects admirably suited to the objects which the doctor had in view, and which he has expressed in his will. * * *

With sentiments of great esteem and regard, believe me, &c.

HENRY J. WILLIAMS.

DR. CH. WILLING.
    December 17th 1870."

Also the letter of December 30th 1870, from Mr. Williams to Dr. Willing, set out at large in the bill.

The master having considered the facts and discussed the reasons of demurrer proceeds:—

"It thus appears that at the time of Dr. Rush's death the defendant was under a pledge, given under circumstances which rendered it '*as sacred as an oath*,' to put the building on a particular site.

"Did that disqualify him from exercising the discretion which the testator had confided to him, and to the exercise of which the complainants were entitled by the terms of the will? * * *

"The discretion which the complainants were entitled to, was the free, voluntary, untrammelled judgment on the question of site of a gentleman long a member of the Library Company, familiar with its wants and wishes. No single individual could have been named upon whose spontaneous opinion as to site the complainants would probably have been more willing to rely. But it was *that* they were entitled to, and nothing less. That was Dr. Rush's will. The will spoke from May 26th 1869, the day of Dr. Rush's death: Potts *v.* Britton, Law Rep. 11 Eq. Cas. 438. * * * To give effect to Dr. Rush's parol wishes *as* his wishes, declared a few days before his death, would be to alter his will contrary to the Statute of Wills. The keeping of the promise to Dr. Rush is not what the plaintiffs are entitled to. That promise was upon Mr. Williams with all the solemnity of an oath, when the duty of exercising an untrammelled discretion was cast on him by the will. Had he at that date any discretion to exercise? He says he had. It is a question, perhaps, on which he is incompetent to judge. In passing upon it, the character and person of the present defendant must be put out of view. Was his discretion free in the view of a court of equity? Cases somewhat analogous will, perhaps, afford us a clue to the answer. * * *

"Mr. Williams avows his intention to carry out the testator's wishes and directions; he denies being a passive instrument, but asserts that in the selection of this site he exercises an untrammelled discretion, which, happily for him, enables him to carry out the testator's instructions, and his counsel insist that this statement being in the answer, and in response to the bill, must be taken to be the fact, unless overthrown by two witnesses, or one witness and sufficient circumstances.

"The master is of opinion that this is not a case for the application of that principle of equity evidence.

"It is impossible for any man, however cool and unimpassioned he may be, to know exactly how far his judgment would be influenced by a promise so solemnly given as that given by the respondent in this case. * * *

"We come, then, to the third question, how is the will to be carried out.

"The answer is, that the court will, either through a new trustee to be appointed by them, or by a decree framed after a report from a master, carry out the intention of the donor if it can be ascertained. * * *

"The conclusions then to which the master has come upon the questions submitted are that the will was not affected by the promise; that the trustee, by his promise, has so crippled his discretion as to make it impossible to say how much his preference for the lot in question is due to his unbiassed opinion that it is the most expedient for the purpose, and how much to his promise to Dr. Rush; that his action in the premises must therefore be under the direction of the court.

"That the complainants have an interest in the selection of the fittest site, which gives them a standing in a court of equity to ask that the selection be made under the supervision of the court; that this course is not to be viewed as an expression of opinion adverse to the site proposed by the executor; that it be referred to a master to inquire and report to the court whether the proposed site is a proper and expedient location for the said building, and if not, what would be such a site? and that the defendant be restrained by injunction from proceeding to erect the said building on the said lot on the south-east corner of Broad and Christian streets until further order. Of course the last specification of demurrer fails with the rest."

The master submitted a form of decree drawn in conformity with his report.

Exceptions were filed to the master's report by the defendant, which after argument, were dismissed December 31st 1872.

Mercur, J., delivered the following opinion :—

"This case comes before me upon exceptions to the report of a master. He was directed to report the law, the facts, and a decree proper to be made therein. Twenty-two exceptions have been filed to his report. The very able arguments of counsel, however, have not been directed to each exception separately, but rather to the discussion of two questions, which may be stated to be covered by these, to wit:—

"First. What powers were vested in the defendant under the trust created by the will of Dr. James Rush in regard to the location and purpose of the library building?

"Secondly. Has he properly executed those powers in selecting the lot at Broad and Christian streets as the site for said library building?

"The first question can be more satisfactorily answered by referring at some length to different portions of the will.

"The testator, by his will of the 26th of February 1860, de-

vised and bequeathed the whole of his real and personal estate to his brother-in-law, Henry J. Williams, his heirs and assigns, in trust, to pay certain legacies, annuities, gifts and bequests, to be thereafter expressed in codicils, and then to hold the residue and remainder of his estate 'in trust, to select and purchase a lot of ground, not less than one hundred and fifty feet square, situate between Fourth and Fifteenth and Spruce and Race streets, in the city of Philadelphia, and thereon to erect a fire-proof building, sufficiently large to accommodate and contain all the books of the Library Company of Philadelphia.' And upon the further trust, ' so soon as this building is completed and ready for occupation, then in trust to convey the same, with the lot of ground whereon it is erected, unto 'The Library Company of Philadelphia' aforesaid, and their successors, for the uses and purposes of their library, and for no other use or purpose whatever.' Providing, however, before such conveyance should be made to the said Library Company, they should, either by an alteration in their charter or in some other way satisfactory to his executor, bind themselves and their successors to conform to, and comply with, certain express conditions therein specified. One of the conditions was 'that all the accounts of the receipts and expenditures from the estates aforesaid, real and personal, shall be kept separate and distinct from all other accounts of the said Library Company, and shall all be headed and kept as the accounts of 'The Ridgway Branch of the Library Company of Philadelphia.' '

" He also appointed Mr. Williams executor of said will.

" By a 'first codicil' thereto, dated the 16th of May 1866, he imposed additional restrictions upon the Library Company, and designated the beneficiaries of the legacies, annuities and gifts indicated in his original will.

" In his ' additional codicil' of the 18th of April 1867, he says, ' I authorize and allow my executor, under a broad and thoughtful foresight, to increase the size of the lot and select any situation he may deem most expedient, without regard to any provision of my will or codicils.'

" On the 18th of May 1869, Dr. Rush purchased by contract a lot at Broad and Christian streets in the city of Philadelphia, for the avowed purpose of having the library building erected thereon, and made a payment of $1000 upon the contract. He held this lot subject to the payment of the residue of the purchase-money at the time of his death. That occurred on the 26th of May 1869. The defendant has selected this lot as the site for the library building. Had he the power in equity so to do? He says, he had: that the will left it to his sole judgment and discretion, and not to the judgment and discretion of anybody else; and in the exercise of that judgment and discretion he has made the selection. Superadded to the power given him in the will he points

[Williams's Appeal.]

to the purchase of this identical lot by the testator, after the execution of his will, with the express object of having the library building located thereon, and claims that was an ademption *pro tanto*.

" I, however, am of the opinion that the doctrine of ademption or double portion cannot be applied to the facts in this case.   The defendant must fall back upon the will, and rely upon that alone, for his authority.   By that instrument he was authorized to select any lot which commended itself to his own free, unbiassed judgment as most suitable.   If no improper influences were operating upon his mind and warping his judgment in the exercise of his discretion, and he acted in good faith, a court of equity will not interfere with that discretion : Hill on Trustees 489 ; Gochenauer *v.* Froelich, 8 Watts 19 ; Chew *v.* Chew, 4 Casey 17 ; Pulpress *et al. v.* Af. M. E. Church, 12 Wright 204.   But discretionary powers like other authorities must be exercised in the manner prescribed by the trust instrument : Hill on Trustees 488.

" To the defendant was given by this instrument the power to select any lot which ' under a broad and thoughtful foresight ' commended itself to his judgment.   The selection must be made under and by the exercise of the defendant's judgment entirely free from any obligation imposed upon it by the testator other than those contained in the will and codicils.   Such a discretion the defendant must bring to the discharge of his trust, and then it only marks the limits of the power given to him.   The exercise of such a discretion the claimants have a right to demand.   They can require no more, and may not submit to any less.

" Secondly. Did the defendant properly use his own discretion, and execute the power intrusted to him in the selection of the lot in question ?   The complainants aver that this site will be prejudicial to the interests of the library, utterly destructive of the trusts which they have hitherto administered, and which they claim it was the manifest design of the testator to promote.   They further allege that the defendant assumed the trust under such a trammelled and crippled discretion that he was thereby disabled from using his natural unbiassed judgment in the selection of the lot. The master concurred in this, and in his very able report has found ' that the trustee, by his promise to the testator, had so crippled his discretion as to make it impossible to say how much his preference for the lot in question is due to his unbiassed opinion that it is most expedient for the purpose, and how much to his promise to Dr. Rush ;' and that the action of the defendant should be subjected to the control of the court.

" This presents the controlling question in the case.   Do the facts and the law justify the master in his conclusions ?

" The evidence shows that some weeks before the death of the testator he became very anxious to have the location of the intended

library building fixed and settled; and he desired the defendant to ascertain the size and cost of all the vacant lots on Broad street (upon which street he desired it to be placed). The defendant procured statements of the sizes and prices of all he thought suitable, from Vine to South street; but Dr. Rush was not satisfied with any of them. Some other gentlemen brought him a plan of the lot on Christian street, and he was so much pleased with it that he directed the defendant to buy it at once. The defendant did so; by the aforesaid contract of May 18th 1869. The doctor thereupon expressed great pleasure that it was concluded, as it relieved his mind from all anxiety. 'Some days after,' says the defendant (in his letter of the 30th December 1870, to Dr. Charles Willing, chairman of a committee appointed by the complainants), " the doctor recurred again to this subject, as it had probably occurred to him that he had given me an absolute discretion as to the situation of the library by the terms of his will, and that I might be induced to overrule his decision after he was gone. He called me to his bedside and asked me to give him a promise that I would build the library on that lot, and nowhere else. I gave him this promise as fully and solemnly as language could express it, and he then thanked me, and said he could now die in peace.'

" In his testimony taken before the examiner on the 17th of April 1872, he says: 'I think it was about the second day after the interview with Mr. Wharton (which he had just stated was on the 20th or 21st of May 1869), when I was seated by Dr. Rush's bedside. I think the lot had been the subject of conversation between us, when the doctor turned to me and said, " Harry, now you will promise me to put the building upon that lot?" I said, " Certainly, doctor, if you desire it; I will promise you that I will put it there, and nowhere else." The doctor merely expressed his satisfaction. I think he said, as near as I can recollect, " Well, I am very glad of it; it is now all settled." '

" The docter died within five or six days thereafter. This promise, then, was demanded and given a very few days prior to his death. It was two years after the last codicil to his will had been executed. It was demanded of a brother-in-law to whom he was about to intrust more than a million of dollars—I say about to intrust, for there was yet time for him to revoke the will and all of its trusts. He was unwilling to pass all his vast estate into the hands of the defendant upon the implied assurance that the library building would be located upon the lot which he had purchased for its site. Hence he made the specific demand. What his action would have been, had the defendant's answer not been in accord with his judgment, is left to conjecture. He suffered his will to remain unchanged. He passed from this earth, there is every reason to believe, in an abiding faith that he had restrained the free

23 P. F. SMITH—18

[Williams's Appeal.]

choice of the defendant, and that he had secured the erection of the library building upon the lot designated by himself.

"What was the position of the defendant? He knew that he had been named in the testator's will as his trustee and executor. Sitting by the bedside of his dying friend and brother—recognising the doctor's right to control his own property—wishing to relieve his mind from all doubt upon the subject that troubled him, the defendant then and there promised, as fully and as solemnly as language could express it, to put the building on that lot and nowhere else. Do not all the attendant and surrounding circumstances impress the mind of every conscientious and reflecting person with the very strong moral obligation thereby imposed upon the defendant? I can scarcely conceive one stronger. The greater the integrity, the higher the moral sense, the stronger would be the obligation upon the conscience. That the defendant possesses both in a high degree is manifest in his letter of the 30th of December before referred to. When asked, in behalf of the claimants, to reconsider his intention of building on said lot, and locate the building elsewhere, his answer was such as did credit alike to his conscience and to his heart. After repeating the promise which he had made, and the circumstances under which it was made, he says:—'Now, do you think it would be at all consistent with truth and honesty for me voluntarily to violate a pledge given under circumstances which render it as sacred as an oath, and made to a dying man who had confided to me the whole of his estate? Would you, with your well-known delicacy and sensibility to all honorable engagements, feel yourself justified in doing so were the case your own, and should I not lose your respect and regard (which I value very highly) were I to hesitate for a moment as to what was my duty?'

"Therein and thereby he proves the indelible stamp made upon his mind. Conscience, resting under an obligation strong as an oath, bound him to the observance of his promise. With that deep recognition of moral obligation resting upon his conscience, he assumed the duties of the trust. He thinks he executed the power and discharged the trust under the written will alone, wholly uninfluenced by his promise.

"The well-known integrity and the high moral character of the defendant do not permit me to doubt that he honestly thinks so. If, however, he be correct, there must have been a time when his conscience was absolved from this deep moral obligation—a time when he threw it off, and when the lawful one took exclusive possession of his judgment. I understand the answer to be that it was at the time he was obligated to take the usual oath in order to assume the duties of executor. This was on the 31st of May 1869. This latter oath, he says, created a legal as well as a moral obligation. Did it, however, wholly eradicate the moral obligation,

'sacred as an oath,' under which he had rested up to that time? In his letter of 30th December 1870, he refers to it as still resting strongly upon him, and that his duty required him to be influenced thereby.

"It is contended, however, inasmuch as the defendant has sworn in his answer, and again before the examiner, that he has considered and decided the question as to the site of the library building entirely irrespective of and uninfluenced by any promise made by him to Dr. Rush, that the complainants have failed to make a case in which a court of equity will interfere with the discretion which he has exercised.

"In considering the act which the defendant has committed, or is about to commit, we must look at the position of the donor, the donee, and of the beneficiaries of the power. The beneficiaries have the right to require the power to be executed according to the terms of the written instrument creating it. If the donor induced the donee to accept the trust under a pledge that he would execute it otherwise than was provided in the instrument, he committed, in equity, a fraud upon the power. If the donee accepted it under such pledge and so executed it, he committed a fraud upon the power. It is not necessarily a moral fraud. A wilful departure from the terms of the power is a fraud upon it, without regard to whether the motive thereto was good or bad: Topham v. The Duke of Portland, 1 De Gex, Jones & Smith 571. Nor does it change the rule of law in regard to the agreement to pervert the trust from the original purpose for which the power was intended, whether that influence be exerted before the appointment or after it, provided that in both cases it secures the consent of the appointee to fulfil the wishes of the appointer: Topham v. Portland, 31 Beav. 539, 540.

"No American authority has been found which covers the case under consideration, but in Topham v. The Duke of Portland, reported in Law Rep. 5 Ch. App. 40, it is held that although the donor and the donee both swore that the power was not executed to carry out any agreement between them, other than those specified in the written instrument, yet that a chancellor might look beyond the oaths and see whether the presence of a moral obligation did not at the date of the appointment, and when the trustee came to act, weigh upon her mind with such force as to make her a passive instrument of the donor's intentions.

"A judge or juror is forbidden to sit in a case wherein a party litigant is closely related to him by blood or marriage. He will not be permitted to purge himself of his disqualification by answering that he can, and will act wholly uninfluenced by such relationship.

"Certain facts, which the wisdom of ages has recognised as in-

fluencing the judgment of mankind generally, create a conclusion of law that they will influence the judgment of each individual.

"Applying the law and reasons to this case, testing the uncontradicted evidence by all those principles which I have ever been taught to believe influence the human mind, and control the actions of men, it does establish such a state of facts as would naturally and reasonably restrain and trammel the free judgment of the donee of a power. Such a general presumption cannot be removed by the honest opinion of a donee that in his particular case he is not influenced thereby. Hence I am unable to conclude that the defendant had, when he made the selection of the lot in question, or has now, such a free discretion and unbiassed judgment as the complainants are entitled to invoke and a court of equity bound to provide. It should, therefore, be referred to a master to inquire and report what will be the most expedient location for said library building, without my indicating any opinion as to whether or not the lot at Broad and Christian streets is a suitable one.

"The exceptions to the report are dismissed, the report of the master is confirmed, and decree accordingly."

The decree was :—

"And now, this 31st day of December, A. D. 1872, this cause came on to be heard upon bill, answer, replication and proofs, and was argued by counsel; whereupon, in consideration thereof, the court are of opinion and so declare, First, that the complainants are competent to, and of right may, when the proper time shall arrive, assume the trust confided to them by the will of the testator, Dr. James Rush ; Secondly, that all the powers to that end conferred on the defendant by the will of the said testator are trusts, in which the complainants have an interest in the nature of property, and which are to be administered by the defendant only in the manner in which all trusts can, or of right ought to be administered ; and it appearing to the court as well by the written admissions of the defendant as by his answer and testimony in this cause, that at and before the time when the said trust vested in him, he had absolutely bound the discretion intended to be given to him by the said will as to the selection of a site for the building proposed by the testator to be erected, and was and is thereby disqualified from, and incapable of exercising the power and trust in that behalf given to him by the said will, and that, in order to carry out the true intent and meaning thereof, the said trust may, and should be now exercised under the supervision of this court according to the course and practice of chancery; it is, therefore, ordered and decreed that it be referred to          Esq., as master, to inquire and report what would be the most expedient situation for the said building, to the end that the true intent and purpose of the testator, as contained in his will, may be carried into full effect. And that he have au-

thority to take testimony in addition to that taken before the ex-
aminer ; And that the defendant be restrained, until further order,
from proceeding to erect the said building on the lot situate at the
south-east corner of Broad and Christian streets ; And the court
reserves all questions of costs and expenses for its further con-
sideration."

The defendant appealed to the court in banc and assigned the
decree for error.

*J. G. Johnson* and *G. Junkin* (with whom was *Woodward*), for
appellant.

*W. H. Rawle* and *R. C. McMurtrie* (with whom was *Mere-
dith*), for appellees.

The opinion of the court was delivered, May 17th 1873, by

AGNEW, J.—This is not an ordinary proceeding. It is an en-
deavor to set aside a man's solemn act, done in the exercise of his
right of property, in his lifetime, when he had absolute power
over his own estate. It is an effort also to declare his friend, the
chosen agent to execute his purpose, invested with absolute dis-
cretion to this end, disqualified to perform his will, because at his
earnest request this friend has adopted and followed the testator's
act. As a consequence, the bill seeks, on the ground of entire
disqualification, to take the actual execution of the will into the
hands of the court, and to declare how much of the *corpus* of the
estate shall be used for that purpose. As a further consequence,
the will must be executed by a stranger—a master acting under
decrees procured from time to time by plaintiffs ; for, by the total
disqualification of the executor, the testator is no longer repre-
sented. This is the frame and purpose of this bill. Such a pro-
ceeding violates the right of private property and the spirit and
purpose of the bill of rights, and cannot be justified except upon
the clearest evidence of the incapacity of the executor, or that he
is acting in fraud of his powers.

The case, briefly stated, is this : Dr. James Rush, a gentleman of
education and fortune, though somewhat peculiar, conceived the
thought of founding a noble charity, at once a public benefit to his
native city, Philadelphia, and a monument to those from whom he
derived his wealth. He pondered the subject and then made
his will. At first he restricted the site of the building to certain
central limits ; but the rapid progress of the city during the event-
ful period of 1860 to 1867, altered his views of location. Fearful,
if his charity were placed near the centre of the city, where pro-
perty was rising rapidly, that the building might be swept away
by the tide of speculation, he made a codicil, revoked the restric-
tion, and enabled his executor to go beyond the limits stated in

his will.    Still reflecting upon his scheme for about two years more, and anxious to locate his charity to suit his own thoughts, he had careful examinations made by his friend and executor, and finding no other site suitable, either in price or size, he finally chose a spacious square on the great central avenue of the city, a few squares south of the original limit, and bought it at a cost of $130,000, or about one-eighth of his entire estate.    Upon this ground he directed his executor to build, and, to secure his co-operation, obtained his promise to do so.    This promise was given, the executor swears most positively, not only out of regard to the testator's wishes, but because the lot and site were approved by his own judgment, founded on a previous examination of all the known eligible sites.    Within a month after the death of Dr. Rush, Henry J. Williams, the executor, consulted eminent counsel as to the obligation of the contract of purchase upon the estate and upon his own duties in making the selection, and was advised by Judge Strong that the purchase was binding, that his power of selection was absolute, and was to be exercised upon his own judgment.

Dr. Rush died on the 26th of May 1869.    Mr. Williams made the selection under the will, and communicated it to the Library Company on the 29th of June 1869, having previously stated it to individual members.    Mr. Williams, the executor, a member himself of the Library Company, having no selfish or hostile interest, an old and skilful lawyer, well informed of his duties, a gentleman of intelligence and refinement, one whose integrity and purity of character are conceded by the plaintiffs to the fullest extent, is admitted to have acted in perfect good faith, and he, on his oath, attests that he acted upon his own judgment.    It is alleged that the selection of the site at Broad and Christian streets, chosen and purchased by the testator, and adopted by the executor, must be set aside, not because of any intent to disappoint the trust, or of the slightest *mala fides,* but because the mind of the trustee was, by reason of a promise to the testator, under a constraint, of which he was unconscious when he made the selection, which made him incapable of exercising his judgment, notwithstanding he swears that he did act upon his own judgment, and because it accorded with his promise.    The proposition, instead of being so plain and clearly established that a court of equity can act upon it to set aside the testator's choice and oust his trustee, is simply incredible, and is destructive of the right of private property.    It denies the power of self-knowledge and the capability of self-examination, upon which the doctrine of accountability for the thoughts and purposes of the heart rests.    It asserts a want of power to introspect our consciousness and motives of action under the responsibility of an oath, and our ability to distinguish between the obligation of a promise and the determination of the judgment in doing an act of importance pondered for weeks.    The case is

brought directly to this point, for the positive, distinct and reiterated assertions of Mr. Williams, in his answer and his testimony, that he did act upon his own judgment, compel us to decide either that he does not know the operations of his own mind, or that he is forsworn. The latter alternative is conceded on all hands to be untrue. Can it be possible that a court, in such a case and on such ground, will depose the executor, cast the property purchased by the testator back upon the estate, wrest the power from his hands, and place it in the hands of others? There is no such case to be found in the books here or elsewhere; and if any can be found abroad, it cannot be imported into this free state. Before examining the law let me state the bearing of the facts.

Was the selection in the line of Dr. Rush's written will? The will is dated in 1860. Dr. Rush devises to Mr. Williams all his estate, in trust, to select a lot not less than 150 feet square, between Fourth and Fifteenth, and Spruce and Race streets; and to erect a fire-proof building sufficiently large, not only for the present wants of the Library Company, but for future extension, according to his own plans and directions; and if he should leave none, then according to Dr. Williams's best judgment and to the views he had expressed to him.

Thus, by the terms of the will, the testator reserved to himself the right to leave written instructions; and if he did not, that the executor should act upon his *verbal* directions. His verbal instructions to his executor are therefore within the very line of the written will. It is a matter of history that the war of the rebellion changed the whole surface of affairs in this city as well as elsewhere, by the inflation of the currency, the rise of prices, and increase of business.

These had a strong influence on Dr. Rush's mind. Let the language of the first codicil express his own thought. Paragraph 26—" Events and circumstances occurring within the last six years have obliged me to make several changes in my will." Then he proceeds to state the risk of making a new will, lest his death within thirty days afterwards might avoid it. "To avoid the possibility of such a result (he proceeds), I must let it stand as it is, and add other provisions as they may occur to me."

The codicil is dated May 16th 1866. No better exposition of the testator's thoughts can be made than thus given to us in his own words, to exhibit the state of his mind when he made the second codicil, of the 18th of April 1867. Remembering this, the testator's change of views since 1860, when the original will was made, is clearly expressed in the language of the second codicil.

Sect. 2. " I have in my will *limited the* extent of the lot to be purchased for the library building, as *well as its localities;* but as I desire that it shall have not only strength, durability and accom-

modation, but also be of *sufficient magnitude for any future or contingent,* but not ambitious or competing increase of the library, *in order to prevent,* if possible, it being torn down in twenty years *and the lot sold at a speculative profit to suit the hyperbole of the times,* I authorize and allow my executor under a broad and thoughtful foresight to *increase the size of the lot,* and select *any* situation *he may deem* most expedient, *without regard to any* provisions of my will or codicils." I have italicised the language to bring out its meaning.

Now, what was the testator's own idea as contained in this very provision (the power in question) of a *broad and thoughtful foresight?*

He tells us himself *to increase the size of the lot,* and to go out of the original limit to select *anywhere.* In a broad and thoughtful foresight he foresaw that the centre of the city would not suit his purpose or his means. He said to his executor, go out and choose elsewhere, so that the magnitude of the building will suit all future time, and that the edifice itself shall not be swept away by the irresistible tide of speculation, to suit, as he termed it, the hyperbole of the times; a figure to express the superlative fancy and spirit of an inordinate inflation of prices.

In the next place, did the testator follow the line of his own thought, as expressed in the will itself? The proof of this is very clear, and is not contradicted. He made inquiries for eligible lots— new examinations made were both within the original limits and without. Mr. Williams himself explored, but found nothing suited to Dr. Rush's purpose. Finally, the lot at Broad and Christian streets presented itself, and here the testator found a site suited to his thought—a large, open square, on the main great avenue of the city, 299½ feet on Broad street, and running back 527 feet on Christian; containing about 3½ acres; at a price of $130,000—a large sum, indeed, but still leaving enough, as he believed, to put up the extensive building which filled his thought, as expressed in the codicil itself. In view of the rapid extension of the city within the last thirteen years, what right have we to say this selection was not made under a broad and thoughtful foresight, and does not meet the views and purposes expressed in the written will and codicils? The views and wishes of the Library Company are outside of the true question, which must be decided upon the will itself.

Next, what were the grounds on which Mr. Williams exercised his discretion? These are best stated in his own words in his answer and sworn testimony.

"I have chosen this site for these, among other reasons:—

"1. It is on the finest street of our city.

"2. It is, so far as I know, the only lot on that street suffi-

ciently large for the building I must erect, which I can obtain at a reasonable cost.

" 3. If compelled to purchase a lot elsewhere, I will not be able to erect the building ordered by the testator.

" 4. I know of no suitable lot on any other street which can be had at the same cost.

" 5. It is but a little distance from the centre of the city, and is within easy reach, by car, of all portions of it.

" 6. It will not be necessary to have the library building torn down in twenty years and the lot sold because of its limited dimensions.

" 7. Its size insures for all time light, air, retirement, quiet and safety from external dangers.

" 8. It already belongs to the estate.

" 9. It is exactly suited to the kind of library Dr. Rush proposed to endow—not a reading-room, nor one containing the light and ephemeral literature of the day, but one for readers and students of a higher grade.

" 10. It will carry out the cardinal intent of the testator, as he understood it, because it is the one he selected himself.

" I adhere to this choice and to my determination to build thereon, notwithstanding the opposition which has been raised, because it was to my judgment, and not that of others, Dr. Rush confided the performance of his testamentary dispositions."

Certainly these are good reasons, and aside from all other evidence, vindicate Mr. Williams's assertion that he acted on his own judgment, for they are processes of thought, or steps which lead to his conclusion. Now, let us see what he says on oath as to the exercise of his own judgment; and first in his answer in direct response to the bill : " I selected the Broad and Christian street lot when I had assumed the executorship, after calm, careful and deliberate consideration, having thought of it in every shape, favorable and unfavorable, in which it had been presented, because it was in my judgment, the best I could obtain for the object and purposes of Dr. Rush's will, and because it combined adequate dimensions with cheapness and position." In regard to his promise to Dr. Rush—the alleged ground of disqualification—after stating his efforts to find a suitable lot, he says : " It was after this that the promise stated in my letter of the 30th December 1870, was made to him. This was given with a knowledge of almost every circumstance which led subsequently to my decision, when, as his executor, it became my duty to determine the site of the library." Again : " I aver that at the time I made said promise I thought it the best lot for the purpose which could be obtained, and I aver that after careful reflection and subsequent examination I still entertain this opinion." There is much more in the answer to the same effect.

His testimony is as strong as his answer.   When asked whether his judgment was not influenced by his promise, he replied: "Not that I am conscious of at all.   I believe if I had made no promise, and had not known the wishes of Dr. Rush, my judgment would have been the same."   Again he said: "If my promise to Dr. Rush, and my oath as executor had been at all in conflict, I would have resigned my executorship at once, and left some other person to put up the building."

Much more he said to the point, but this will suffice to show the strong and positive convictions of his mind.   In these assertions he is also strongly corroborated by the testimony of many witnesses as to what took place just before Dr. Rush's death, and the communication of the selection of the lot to Mr. Wharton, Mr. Biddle and others.   He consulted counsel, as proved by Judge Strong's letter of the 15th of June 1869, before the meeting of the Library Company, on the 29th of June, when his selection was formally made known.   A committee of conference was appointed at this meeting.   To Mr. Fraley, one of the committee, who suggested other lots, he replied that they had all been examined, and that the prices were so high they did not suit Dr. Rush, and that the lot at Broad and Christian streets had been selected because, in the judgment of both Dr. Rush and *himself*, it combined all the advantages which he wished to secure.   He again consulted Judge Strong, who replied July 19th 1869, saying: "As executor, you are guided by the written will.   In the exercise of the discretion reposed in you by that instrument, you may regard Dr. Rush's views and wishes orally expressed; but after all *your* judgment, however it may be made up, must be your guide in matters left to your discretion."   Again urged by Mr. Fraley to change the selection on the 6th of August 1869, he replied: "*I deem* that situation (the Broad and Christian lot) most expedient under all the circumstances of the case, for I *consider* its distance from the centre of the city as far outweighed by its other advantages, and I have the consolation of knowing that this decision is in entire accordance with the wishes of the testator, who selected and purchased this lot for this very purpose in his lifetime."   The Library Company themselves knew he had exercised his own judgment in the matter.   A meeting was called for the 19th of October 1869, to vote on the acceptance or rejection of the provisions of Dr. Rush's will.   Committees were raised *pro* and *con* to influence the opinions of the members when the meeting should take place, and circulars were issued.

On one site it was said: "But the executor of Dr. Rush, both from the expressed wishes of the testator during his life, as well as from *his own judgment of the suitableness* of the selected site, is indisposed to change it."   The other side said: "The will gives to the executor the *absolute right* to select the location, and to

construct the building, and *this discretion has been exercised*, by selecting Broad and Christian streets as *the most suitable spot* in the city for the purpose." Against this overwhelming evidence, the positive oath of Mr. Williams, the contemporary circumstances, and the understanding of the Library Company, how can the conclusion be drawn that Mr. Williams did not exercise his own judgment?

It was after all these things had occurred, and nineteen months after the death of Dr. Rush, the letter of December 30th 1870, was written, the stronghold and fortress of the plaintiffs' bill. The object and purpose of this letter are made obvious by the circumstances which have evoked it. Controversy had arisen, and the Library Company had made several efforts to induce Mr. Williams to revoke his selection, and finally, at a meeting of the company, on the 10th of December 1870, resolutions were passed, one of which expressed the "earnest hope and *request* that Mr. Williams would *reconsider* his intention to build on the site chosen." Dr. Willing, Judge Hare and Mr. Lea were appointed a committee to confer with Mr. Williams, and a correspondence ensued, in which Mr. Williams adhered to his selection. The letter of December 30th 1870 was then written, at the invitation of Dr. Willing, as a *formal* expression of Mr. Williams's intentions. He restates his convictions, and expresses his surprise that he should be again asked to change his intentions, and proceeds to defend himself against censure for refusing to change his mind. Then he pleads the sacred character of his promise. He cannot yield his judgment, but pressed hard to do so, he appeals to the well known sensibility of the gentlemen composing the committee, to all honorable engagements, if the case were their own. He repeats, also, what he has always said, that to change would be in opposition to *his own deliberate judgment ;* and "*I mean this* (he adds) *in its fullest sense.*" This letter, written at the close of the year 1870, long after the controversy had existed, in defence of his motives and his reputation, evoked by the direct action of the Library Company, instead of proving that Mr. Williams acted without judgment, and from unconscious restraint, proves the convictions of a mind thoroughly convinced, and a heart that was fixed upon a just purpose. Admit that he was also influenced by his promise to his friend. So he ought to be, when, as he swears, it was an approving judgment. This is a proper influence, and does not show a man void of discretion, and so bound by conscience that his judgment is lost in the obligation of a foolish pledge.

How far, then, will a court of equity go in regarding a promise to a testator, as in fraud of his written will? Here I think the plaintiffs do not discriminate well. That a verbal direction of a testator in conflict with a power contained in his will, cannot alter

the written terms of the power, is beyond contradiction, and to this extent this argument may fairly go.

But that a court of equity can pronounce the verbal direction, and, still stronger, the *act* of this testator, in the very line of his own power, and a promise to conform to it, *ipso facto*, a fraud on the power, is contrary to reason and the plainest principles of equity. The reverse is true, for it is the province of equity to follow the mind of the testator. So clear is this principle, that a court of equity will sometimes convert the devisee, even of an absolute estate, into a trustee, in order to compel him to perform a solemn promise given to his testator to dispose of the property according to his verbal direction. In doing this the written will is struck down to reach the equity that lies in the verbal direction. Such was the case of Hoge *v.* Hoge, 1 Watts 163, where the testator devised an estate to his brother absolutely, under a verbal direction that it should be for the benefit of his illegitimate son. Chief Justice Gibson cites in his opinion a number of cases where the verbal direction was sustained against the text of the will— one, for instance, where a testator having devised his lands to a nephew, desired his heir-at-law not to disturb the nephew in possession of certain lands acquired after the execution of the will, and it was so decreed. Now if a court of equity, to prevent a fraud upon the testator's actual intention, will disregard the written text, how much more consonant to equity is it to regard the solemn act of a testator who has involved his estate in the obligation of a contract in the line of a will, and to carry out its very intent; and how can it regard the promise of the executor to follow the wishes of the testator in this respect, as *ipso facto*, a fraud upon the testator's power.

On what principle of sound reason, conscience, or equity can the selection of this lot by the executor be pronounced a fraud on the power, or a disappointment of the power, or as an undue and improper execution of the purpose of the testator as contained in his written will? How has the promise to the testator vitiated the selection? What provision of the will does it offend? How can we say the selection is not made with a broad and thoughtful foresight? On the contrary, it conforms both to the will and the purpose of the testator. In following the testator's own act of purchase, nothing but the clearest evidence of incapacity in the testator to select, or of folly in the selection, and of blind and unreasoning obedience in the executor, can set it aside. I am willing to concede the authority of all the cases cited for the plaintiff, including the Duke of Portland's case. They may be summed up in a single view—that a chancellor will so control a trustee that he shall not disappoint the true intent and purpose of the donor, as gathered from the instrument containing the power. To execute it otherwise is a fraud on the power. Hence, it is said,

" he must execute it *bonâ fide for the end designed.*"   It may be a corollary, also, that an innocent motive will not save the exercise of the power, if it violate the true purpose of the trust.   Broader than this there can be no conception of chancery power in Pennsylvania, where the citizen is secured by the constitution in his rights of property.   When a testator, to fulfil his own purpose, confers an absolute discretion as to his property, it is *his* right to have the boon executed by his own trustees; and no court can, without clear and adequate cause, displace the trustee without violating the right of property.

This is well expressed in the letter of advice of 15th June 1869, from Judge Strong, under which Mr. Williams acted.   " A court of equity does not interfere with a discretion reposed, except in cases of *clear* abuse, when the court *can* conclude that the donee of a power is *acting in fraud of it.*   But when, as in your case, the trustee acts in accordance with his own best judgment, and in so doing, follows the positive directions of his testator, it would be altogether *unprecedented for a court to interfere and substitute* its discretion for that invoked by the will."   In this statement he is most distinctly supported by two recent cases decided by this court: Pulpress *v.* African Church, 12 Wright 204, and Naglee's Estate, 2 P. F. Smith 154.   To these may be added a few citations from elementary writers.   In the recent work of Mr. Perry on Trusts, the modern decisions are brought up.   On page 455, section 508, he says, when the discretion to be exercised is a matter of personal judgment, " the trustees alone can exercise these powers, and courts cannot generally interfere to control mere personal judgments in personal matters."   For this, numerous cases are cited.   Again on page 457, section 511, " If the trustees exercise their discretionary power in *good faith,* and without fraud or collusion, the court cannot review or control their discretion."   For this, twenty-four cases are cited.   " Nor will a bill be entertained to compel the execution of a mere discretionary power." Id.   Mr. Hill, in his work on Trustees, ed. 1846, p. 482, says, " as a court of equity will not, in general, assume the exercise of a discretionary power vested in trustees, so it will not interfere to control the trustees acting bonâ fide in the exercise of their discretion."   He cites many cases for this statement.

In conclusion, there is no ground in fact or in law, on which the prayers of this bill can be supported.

The decree of the court at Nisi Prius is, therefore, reversed, and the bill is ordered to be dismissed at the cost of the plaintiffs.

READ, C. J., and MERCUR, J., dissented.